**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PPG INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15-cv-00965 |
| | ) | |
| JIANGSU TIE MAO GLASS CO., LTD., | ) | |
| et al, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

**Mark R. Hornak, Chief United States District Judge**

In February 2015, PPG Industries, Inc., learned that one of its former employees stole and then sold multi-million-dollar trade secrets to Jiangsu Tie Mao Glass Company ("TMG"), a Chinese competitor of PPG. PPG would go on to learn that TMG engaged in a years-long effort to obtain its proprietary information from the former employee in exchange for tens of thousands of dollars funneled to the employee via a TMG representative's bank account. In the weeks and months following the news, the Federal Bureau of Investigation arrested the former PPG employee and a federal grand jury him for stealing PPG's trade secrets.

It was also during those months that PPG initiated this civil action against TMG and two (2) of its representatives, Benhua Wu and Mei Zhang (collectively, "Defendants"). PPG's Complaint alleged several claims, and after Defendants failed for years to answer the Complaint, PPG sought an entry of default. Now, PPG moves for a default judgment on its trade secrets misappropriation claim. Defendants, having entered an appearance at the last minute, move to set aside the Clerk's entry of default. PPG's motion is **GRANTED IN PART** as set forth below, and is also **DEFERRED IN PART** without prejudice, and Defendants' motion is **DENIED**.

1

# I. **BACKGROUND**

TMG and PPG are competitors in the transparencies industry—meaning that they manufacture and sell commercial glass products, such as airplane windows. TMG maintains its headquarters in China, while PPG operates out of its Pittsburgh, Pennsylvania main office. At issue in this case are Defendants' efforts to misappropriate a wide array of PPG's proprietary transparencies-related manufacturing processes, in particular those related to a product called Opticor. Starting in 2013, Defendants colluded with a former PPG employee, Thomas Rukavina, to unlawfully acquire PPG's proprietary technology and information. During the two-and-a-half years when Defendants operated their trade secrets stealing scheme, they paid Rukavina over $100,000 for proprietary PPG information. Eventually, however, the law caught up to Defendants. PPG got wind of the conspiracy and alerted the FBI, who promptly arrested Rukavina.

Shortly after Rukavina's arrest, PPG brought this action against TMG, as well as Benhua Wu and Mei Zhang. Wu serves as TMG's general chairman—the equivalent of a chief executive officer. According to PPG's Complaint, Wu personally oversaw the effort to steal PPG's trade secrets with Rukavina's help. Zhang serves as a purchasing agent for PPG. According to the Complaint, she served as Rukavina's handler—often helping TMG funnel money from its corporate account to Rukavina's personal bank account—and personally assisted in TMG's efforts to trick a PPG subcontractor into supplying additional confidential information.

In its Complaint, PPG included claims under the federal RICO statute and Pennsylvania tort and contract law, as well as a Pennsylvania Uniform Trade Secrets Act ("PUTSA") misappropriation claim. (Compl., ECF No. 1.) After several unsuccessful attempts to serve Zhang at her California home, PPG moved the Court for an Order deeming service on Zhang complete via electronic service. The Court approved that request (ECF Nos. 24 and 25.) As for Wu and

TMG—both located in China—PPG retained a professional vendor and completed service in a manner consistent with the Hague Convention. (ECF Nos. 32; 33; 35; and 36.)

Despite PPG serving all Defendants, none filed an Answer or any motion in response to PPG's claims. While it waited, PPG served all Defendants with requests for admissions. (ECF No. 107, at 6.) Like PPG's Complaint, those requests went unanswered. (*Id.*) Then, in October 2017, PPG filed a request for an entry of default from our Clerk of Court. (ECF No. 79.) The Clerk promptly granted PPG's request. (ECF No. 80.) In preparation for an eventual default judgment motion, and because Defendants' failure to participate in this case deprived it of traditional civil discovery, PPG engaged in significant third-party discovery following the entry of default. (ECF No. 104.)

In May 2019, PPG moved the Court for a default judgment and permanent injunction against Defendants on its PUTSA misappropriation claim. (ECF Nos. 106 and 107.) In addition to that motion, PPG moved the Court for an award of exemplary damages and attorneys' fees, costs, and expenses. (ECF Nos. 114 and 121.) At the final hour, Defendants entered an appearance and moved to set aside the entry of default. (ECF Nos. 129 and 130.) Defendants also opposed PPG's motion for a default judgment—though the bulk of their arguments in opposition went more toward damages mitigation than to liability. The parties fully briefed their respective motions. (ECF Nos. 136; 137; 144; and 146.) With briefing complete, the Court scheduled oral argument for late January 2020. (ECF No. 153.)

Having heard arguments on the motions and considered the parties' written submissions, the Court now decides PPG's Motion for Default Judgment and Permanent Injunction (ECF No. 106), and Defendants' Motion to Set Aside Entry of Default. (ECF No. 129.)

## II.    <u>DEFENDANTS' MOTION TO SET ASIDE DEFAULT</u>

Defendants move to set aside the default entered by our Clerk of Court. (ECF No. 129.) They base their motion entirely on the argument that this Court lacks personal jurisdiction over all three (3) Defendants. And without personal jurisdiction, Defendants argue, the Court is without the power to enter a default or grant a default judgment against them. Despite Defendants' argument that their contacts with Pennsylvania amounted to only "two email chains" that Rukavina initiated, the Record demonstrates otherwise. PPG provided more than enough evidence to establish this Court's personal jurisdiction over TMG, Zhang, and Wu. Defendants' Motion to Set Aside the Default (ECF No. 129), is denied.

The Third Circuit's usual standard for assessing a motion to set aside a default requires the Court to examine three (3) factors. First, the Court must ask whether the defendant has a meritorious defense. Without the potential to present a winning defense, the Court should deny the defendant's motion to set aside a default. Second, the Court must ask whether setting aside the default prejudices the plaintiff. Third, the Court must ask whether the default resulted from the defendant's culpable conduct. *See, e.g.*, *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984).

But our Court of Appeals has also held that the three-factor test only applies when the question of setting aside the default is left to the Court's discretion. When the default is void, the Court need not invoke the three (3) factors listed above. *See Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir. 1985) ("[I]t is not necessary for us to resort to an analysis of those factors in this case because they apply only when the default judgment was authorized and the only question before the district court is whether to exercise its discretion to set aside the default."). Instead, when the entry of default is void, it would be legal error for the Court to deny the

defendant's motion to set it aside. *See id.*; *see also United States v. One Toshiba Color Tele.*, 213 F.3d 147, 156–57 (3d Cir. 2000).

Here, Defendants do not argue that the usual three-prong *U.S. Currency* standard tilts in favor of setting aside the default.[1] Instead, they argue that because the Court lacks personal jurisdiction, the default is void. PPG, on the other hand, invokes the three-prong *U.S. Currency* standard. But its merits prong arguments all revolve around why this Court *does* have personal jurisdiction over all three (3) Defendants. So the parties' apparent disagreement over what standard applies ultimately does not make any difference to the Court's analysis, because if the Court has personal jurisdiction, it will deny Defendants' motion.

## A. **Personal Jurisdiction**

Personal jurisdiction comes in two (2) flavors: specific and general. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–15 (1984). General jurisdiction is all-purpose—allowing a court to exercise jurisdiction over the defendant for any claim lodged against that party. *Id.* at 414 & nn.8–9. Specific jurisdiction, on the other hand, depends on the connection between the plaintiff's claim and the defendant's contacts with the forum state. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945). Because none of the Defendants in this case are "at home" in Pennsylvania, PPG rightly does not argue that the Court has general jurisdiction over any Defendant. *Cf. Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). On the other hand, PPG does argue that this Court has specific jurisdiction to decide these claims against these Defendants. The Court agrees with PPG's assessment.

When a federal court must determine whether it has specific jurisdiction over a party, there

---

[1] Although Defendants reference the three-prong *U.S. Currency* standard, they do not discuss the prejudice and culpability prongs. (ECF No. 144, at 2 n.1.) Rather, they argue that the lack of personal jurisdiction, by itself, requires setting aside the default.

are typically two (2) sources of law that it must consider. The first source is state law, because under the Federal Rules of Civil Procedure, federal courts exercise personal jurisdiction according to the law of the state where the court sits. *See* Fed. R. Civ. P. 4(k)(1)(A). The second source is the United States Constitution, because the Due Process Clause constrains a state's power to exercise jurisdiction over a nonresident. *See Walden v. Fiore*, 571 U.S. 277, 283–84 (2014).

Here, the relevant state law is Pennsylvania's long-arm statute. *See* 42 Pa. Cons. Stat. § 5322(b). That statute gives Pennsylvania's courts jurisdiction over nonresidents "to the fullest extent allowed under the Constitution of the United States." *Id.* So the state law and federal constitutional law questions merge in this case. And so long as the Court can exercise specific jurisdiction over Defendants consistent with due process, it can do so consistent with Pennsylvania's long-arm statute.

When the plaintiff brings an intentional tort claim, there are two (2) tests that the Court can apply to determine whether exercising personal jurisdiction over the defendant comports with due process. First is the "traditional test," which applies to all varieties of claims. In short, that test asks whether the defendant has constitutionally sufficient minimum contacts with the forum state and whether the court's exercise of jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Int'l Shoe Co.*, 326 U.S. at 316–17. Second is the so-called "*Calder* effects test," which only applies to intentional tort claims. *See Calder v. Jones*, 465 U.S. 783 (1984).

The burden is on PPG to establish this Court's personal jurisdiction over Defendants. *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). Although default constitutes an admission of all well-pleaded facts on the merits of a plaintiff's claim, it does not constitute an admission of the facts needed to establish personal jurisdiction. *See, e.g.*,

*"R" Best Produce, Inc. v. DiSpaio*, 540 F.3d 115, 125 (2d Cir. 2008); *Jackson v. FIE Corp.*, 302 F.3d 515, 531 (5th Cir. 2002). After full briefing, the Court held a hearing on Defendants' jurisdictional arguments and the parties' stipulated to the admissibility and authenticity of the exhibits attached to their filings. (ECF No. 151, at 2.) As a result, the Court will draw its jurisdictional fact-finding from that hearing and those exhibits. With that, the Court will apply both the traditional test and *Calder* effects test to all Defendants.

### 1. <u>Traditional Test</u>

There are three (3) parts to the traditional test for specific jurisdiction: (1) the defendant purposefully availed itself of the privilege of conducting activities within the forum; (2) the plaintiff's claim arises out of the defendant's contact with the forum; and (3) the court's exercise of jurisdiction comports with fair play and substantial justice. *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316–18 (3d Cir. 2007) (first citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); then citing *Helicopteros*, 466 U.S. at 414; then citing *Int'l Shoe*, 326 U.S. at 316)).

First, to establish the purposeful availment prong, the plaintiff does not need to show that the defendant physically stepped foot in the forum state. *See Burger King*, 471 U.S. at 476. In fact, our Court of Appeals has held that "[m]ail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction." *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993). Even a single contact with the forum state can support jurisdiction, "so long as it creates a 'substantial connection' with the forum." *See Burger King*, 471 U.S. at 475 n.18 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

The mere fact that email, phone calls, or regular mail end up in the forum state is not enough

to show purposeful availment. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454–55 (3d Cir. 2003); *see also Burger King*, 471 U.S. at 475 (holding that fortuitous, sporadic, or random contacts are insufficient). Instead, the plaintiff can only establish the purposeful availment prong by showing that the defendant "deliberately reached into Pennsylvania to target . . . its citizens." *O'Connor*, 496 F.3d at 318. In other words, the defendant's minimum contacts must allow the defendant to reasonably foresee being haled into the forum state's courts. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The facts of *O'Connor*, a personal jurisdiction mainstay in our Circuit, provide helpful insight into the traditional test's first prong. There, a Pennsylvania couple sued a Barbados-based hotel in the Middle District of Pennsylvania after one of the plaintiffs suffered a slip-and-fall injury while at the hotel. *See O'Connor*, 496 F.3d at 315. The plaintiffs tried a number of techniques to establish the hotel's contacts with Pennsylvania. First they argued that they heard about the hotel from friends and a travel agent in Pennsylvania. *See id.* at 318. The Third Circuit rejected that argument, because the hotel was not a party to those conversations. *Id.* Next the couple argued that they previously visited the hotel in Barbados. *Id.* But the Third Circuit easily parried that argument, since it is contacts with Pennsylvania that mattered, not contacts with Pennsylvanians. *Id.* On the other hand, when the hotel (1) mailed newsletters to the couple's Pennsylvania home after their first stay; (2) mailed brochures to their home ahead of their second stay; and (3) traded phone calls about a spa package for that second stay, the Third Circuit said the hotel reached into Pennsylvania to target its citizens. *Id.* So the contacts need not be monumental—they are called *minimum* contacts, after all—but they must be deliberate. *See id.*

Second, once the Court identifies the defendant's contacts with the forum state, it must ask whether the plaintiff's claims "arise out of or relate to at least one of those contacts." *Id.* (quoting

*Helicopteros*, 466 U.S. at 414) (internal quotation marks omitted). Both the Supreme Court and our Court of Appeals have declined to adopt a bright line rule for this relatedness inquiry. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 99–100 (3d Cir. 2004). The Third Circuit has, however, emphasized that the "animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable." *See O'Connor*, 496 F.3d at 322 (citing *Burger King*, 471 U.S. at 475–76). Thus, the relatedness requirement "must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." *Id.* at 323. While this is a "somewhat looser" standard than proximate causation, it is "intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable." *Id.*

Third, the Court must ask whether exercising jurisdiction over the defendant would "comport with traditional notions of fair play and substantial justice." *Id.* at 324 (quoting *Int'l Shoe*, 326 U.S. at 316) (internal quotation marks omitted). Once the Court identifies minimum contacts, it is presumptively constitutional for the Court to exercise personal jurisdiction over the defendant. *See Burger King*, 471 U.S. at 477. So the onus is on the defendant to present a "compelling case" that certain factors make exercising jurisdiction unreasonable. *See id.* The Supreme Court has identified several factors courts should use to implement that traditional test's third prong. Among these are (1) the burden on the defendant; (2) the State's interest in adjudicating the dispute; (3) the plaintiff's interest in achieving convenient and effective relief; (4) the judicial system's interest in obtaining an efficient outcome; and (5) the procedural and substantive interests of other nations. *See O'Connor*, 496 F.3d at 324 (first citing *Burger King*, 471 U.S. at 477; then citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987)).

Beyond the traditional test's three (3) prongs, there is an additional case-specific issue the

Court should consider during its personal jurisdiction analysis. When asked to exercise jurisdiction over a corporate officer in his or her individual capacity for corporate acts, some courts of appeals apply the so-called "corporate shield" doctrine.[2] *See, e.g.*, *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 764 (10th Cir. 2011). That doctrine sometimes protects corporate officers who are sued in their individual capacity for purportedly corporate acts. *Id.* But the "corporate shield" doctrine does not protect a corporate officer who was personally involved in the corporation's tortious conduct. To tell if this tortious conduct exception applies, the Court should consider (1) the officer's role in the corporation; (2) the nature and quality of the officer's contacts with the forum; and (3) the extent and nature of the officer's personal participation in the tortious conduct. *Cf. KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, No. 08-cv-2201, 2010 WL 1047807, at *7 (E.D. Pa. Mar. 19, 2010) (applying "corporate shield" doctrine in context of PUTSA misappropriation claim against corporate officer in individual capacity).

### i.     *Mei Zhang and TMG*

The Court can examine its ability to exercise personal jurisdiction over Mei Zhang and TMG in the same analysis.[3] In its response to Defendants' Motion to Set Aside the Default, PPG attached a series of emails sent to and from Zhang. In many of those emails, Zhang used a signature block listing TMG as her employer, as well as her TMG email address and phone number. (ECF No. 136-1, at 11, 73, 75, 77–82.) The signature block also included a link to TMG's website. (*Id.*) And many of Zhang's emails were directly sent to or carbon copied Wu and other TMG employees. (*Id.* at 77.) What's more, the contents of Zhang's emails relate to TMG obtaining PPG's trade

---

[2] The Third Circuit has never expressly adopted the "corporate shield" doctrine. *But see Cerciello v. Canale*, 563 F. App'x 924, 927–28 (3d Cir. 2014) (unpublished decision discussing the "corporate shield" doctrine).

[3] In their reply brief, Defendants similarly combine the personal jurisdiction analysis for Mei Zhang and TMG. (ECF No. 144, at 5.)

secrets and the steps TMG intended to take to make use of those trade secrets. In other words, the emails Zhang sent show that she held a senior role at TMG; many of those emails went to people in Pennsylvania; and all of this was in furtherance of TMG's efforts to misappropriate PPG's trade secrets. Therefore—so long as her contacts satisfy the constitutional test—Zhang's position at TMG, contacts with Pennsylvania, and personal participation in TMG's scheme allow the Court to exercise jurisdiction over Zhang in her individual capacity, as well as over TMG for her actions on its behalf. With that, the Court will apply the traditional test to Zhang and TMG's contacts.

The first prong of the traditional test asks whether Zhang and TMG purposefully availed themselves of the privilege of conducting activities within Pennsylvania. The Court easily concludes that they did. Through its filings in response to Defendants' Motion to Set Aside the Default on personal jurisdiction grounds, PPG meticulously outlined Zhang and TMG's many contacts with Pennsylvania. (ECF No. 136.) Zhang and TMG's contacts with Pennsylvania can be grouped into three (3) categories: (1) Zhang's emails sent to Rukavina in furtherance of the trade secrets misappropriation scheme; (2) Zhang and TMG's wire transfers to Rukavina's Pennsylvania-based bank account; and (3) Zhang's emails to PPG's Pennsylvania-based supplier attempting to acquire PPG's proprietary molds.

For the first set of contacts, PPG directs the Court to the many emails that Zhang sent to Rukavina about obtaining PPG's trade secrets.[4] The theme of their correspondence is Zhang badgering Rukavina to provide PPG's trade secrets and Rukavina pressing Zhang for money. In one such email, after Rukavina sent Zhang "detailed metal mold drawings"—PPG's proprietary information—Zhang responded asking Rukavina to send her PDF copies that she would "send . . .

---

[4] PPG submitted evidence that Rukavina lived in western Pennsylvania throughout the timeframe referenced in the Compliant. (*Id.* at 3.) And although Defendants did not concede this, neither did they present any evidence to the contrary.

to [TMG's] vendors in China to start make [sic] them asap." (*Id.* at 73.) Elsewhere, Zhang emailed Rukavina a link to the website for a PPG supplier asking whether she should contact the supplier to obtain PPG's proprietary molds. (*Id.* at 75.) In another, after Rukavina emailed Zhang for updates on when he could expect his "salary," Zhang emailed back telling Rukavina: "It will be transferred from the account of the company not from my account. Wait for a couple of days." (*Id.* at 10.) Finally, perhaps meeting the gold standard of nefarious purposeful availment, Zhang emailed Rukavina the following message about her efforts to obtain PPG's molds from the supplier: "I removed the logo of PPG and their name from the pictures. Hope I did in a legal way. Just sent an e-mail to the purchasing manager. Let's wait the feed back [sic] from him." (*Id.* at 81.)

Zhang and TMG's second set of contacts with Pennsylvania involve them wiring money to Rukavina's Pennsylvania-based bank account. (*Id.* at 22–72.) During these transactions, Zhang typically acted as the go-between for TMG and Rukavina—meaning that TMG wired money to Zhang's account, then Zhang wired that money to Rukavina for his efforts in their ongoing scheme. The following transactions demonstrate Zhang and TMG's efforts to reach into Pennsylvania as part of their scheme:

- July 16, 2014, TMG transferred $10,000 from its Bank of China account to Zhang's California-based Bank of America account. Two (2) weeks later, on July 31, 2014, Zhang transferred the $10,000 to Rukavina's Pennsylvania-based PNC Bank account. (*Id.* at 28, 60.)

- September 30, 2014, TMG transferred $10,957 from its Bank of China account to Zhang's Bank of America account. That same day, Zhang transferred $10,957 to Rukavina's PNC account located in Pennsylvania. (*Id.* at 30–31, 62.) This happened two (2) weeks after Rukavina emailed Zhang asking for payment and Zhang replied telling him it would be

coming shortly. (*Id.* at 10.)

- November 14, 2014, TMG transferred $20,000 from its Bank of China account to Zhang's Bank of America account. Three (3) days later, on November 17, 2014, Zhang transferred $20,000 to Rukavina's PNC account located in Pennsylvania. (*Id.* at 33, 64.)

- December 16, 2014, TMG transferred $40,000 from its Bank of China account to Zhang's Bank of America account. That same day, Zhang transferred $20,000 to Rukavina's PNC account. (*Id.* at 35, 66.)

- February 4, 2015, TMG transferred $40,000 from its Bank of China account to Zhang's Bank of America account. On March 13, 2015, Zhang transferred $20,000 to Rukavina's PNC account. (*Id.* at 37, 39, 69.) Throughout February 2015, Zhang and Rukavina exchanged testy emails over what Zhang perceived to be Rukavina's slow response to inquiries from PPG's Pennsylvania-based supplier. This, perhaps, explains the longer-than-usual gap between the TMG-to-Zhang transfer and the Zhang-to-Rukavina transfer. By March 2015, however, the emails appear to show Rukavina and Zhang back on track with their scheme to obtain PPG's proprietary molds from the supplier. (*Id.* at 73–81.)

- March 16, 2015, TMG transferred $30,000 from its Bank of China account to Zhang's Bank of America account. Then on March 27, 2015, Zhang transferred $10,000 to Rukavina's PNC account. (*Id.* at 41–42.)

- On April 2, 2015, TMG transferred $26,684 from its Bank of China account to Zhang's Bank of America account. Then on April 29, 2015, TMG transferred another $30,000 to Zhang's Bank of America account. On May 6, 2015, Zhang transferred $10,000 to Rukavina's PNC account. (*Id.* at 41, 44–45.)

The pattern of TMG wiring money to Zhang, then Zhang wiring money to Rukavina's

Pennsylvania-based bank account, demonstrates Zhang and TMG's purposeful availment. The transferred funds ended up in a Pennsylvania-based PNC Bank account. (*Id.* at 69.) And that PNC Bank account belonged to a Pennsylvania resident, Rukavina. (*Id.*) What's more, the TMG-to-Zhang-to-Rukavina transactions did not end up in Pennsylvania by happenstance. *Cf. Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.*, 746 F.2d 208, 212–15 (3d Cir. 1984) (noting that "incidental economic" contacts are not purposeful availment). Rather, those contacts happened because TMG and Zhang took affirmative steps to reach into Pennsylvania to target its citizens.[5]

The third category of contacts between Zhang, TMG, and Pennsylvania, involve Zhang's emails to PPG's Pennsylvania-based supplier. In February 2015, Zhang contacted Alle-Kiski Industries ("AKI"), one of PPG's industrial suppliers located in Leechburg, Pennsylvania. (*Id.* at 86.) Before contacting AKI directly, Zhang emailed Rukavina a link to AKI's website and asked whether Rukavina thought AKI could make TMG the same molds that AKI produced for PPG. (*Id.* at 75.) That website identifies AKI's place of business as Leechburg, Pennsylvania. And when an AKI representative replied to Zhang's email inquiry, that AKI employee's email listed Leechburg, Pennsylvania as the business's location in his signature block. (*Id.* at 88.) Following the initial email introductions, Zhang continued to contact AKI or instruct Rukavina to contact AKI on TMG's behalf. (*Id.* at 82–91.) And when Zhang told Rukavina that she removed PPG's logo from the proprietary documents Rukavina provided, she was referring to the altered

---

[5] In this regard, TMG and Zhang's transfer's to Rukavina's PNC Bank account are essentially analogous to letters or emails sent into Pennsylvania to target its citizens. In the same way that parties might exchange letters as a way to move the ball forward on some joint project, Zhang and Rukavina's pattern involved him sending her PPG's proprietary information and her sending him money. The fact that the bank transfers involved a monetary transaction does not change the fact that Zhang initiated those transactions to benefit Rukavina in Pennsylvania for his role in the illicit scheme. Of course, not every bank transfer will justify jurisdiction in the district that houses the endpoint bank account, since a bank account might be set up in one state to benefit an individual in another. But here, Rukavina's PNC Bank account was housed in Pennsylvania, to benefit him in Pennsylvania, and received transfers from Zhang and TMG who knew Rukavina was in Pennsylvania and wanted him to assist in their tortious conduct in Pennsylvania. As if this were unclear, the theme of these TMG-to-Zhang-to-Rukavina transactions is Zhang and TMG's extensive efforts to reach into Pennsylvania through their tortious conduct.

documents that she sent to AKI.[6] (*Id.* at 81.)

In the Court's estimation, just one (1) of these categories would be enough to satisfy the traditional test's first prong. Zhang's emails to Rukavina, while he lived in Pennsylvania, demonstrate a pattern of contacts with this forum. Zhang's emails to Rukavina, the Third Circuit says, count as contacts with Pennsylvania for the traditional test's first prong. *See Grand Entm't Grp.*, 988 F.2d at 482. The TMG-to-Zhang-to-Rukavina wire transfers were not one-off incidents. Instead they were part of a calculated effort by Zhang and TMG to reach into Pennsylvania. *See O'Connor*, 496 F.3d at 315–17. As were Zhang's communications with AKI, a PPG supplier located in Pennsylvania. *See id.* With all three (3) categories of contacts, the Court is left without an iota of doubt that Zhang and TMG purposefully availed themselves of the privileges of conducting activities in Pennsylvania.

The traditional test's second prong asks whether PPG's claim arises out of Zhang and TMG's contacts with Pennsylvania. Again, the Court easily concludes that PPG met its burden. No serious observer could say that Zhang and TMG's many contacts with Pennsylvania are unrelated to PPG's trade secret misappropriation claim. Instead, many of Zhang and TMG's contacts involve conduct taken in direct furtherance of TMG's efforts to steal PPG's proprietary information. Neither our Court of Appeals nor the Supreme Court have clearly articulated the outer limits of the relatedness prong. *See Miller Yacht Sales*, 384 F.3d at 99–100. But the facts of this case do not even remotely implicate those outer limits. Instead, the Court's ability to exercise personal jurisdiction over Zhang and TMG for PPG's trade secrets misappropriation claim is "closely tailored" to Zhang and TMG's contacts with Pennsylvania. *See O'Connor*, 496 F.3d at

---

[6] Zhang sent the email to Rukavina saying she removed PPG's logo from the documents only hours after she made the initial contact with AKI. (ECF No. 136-1, at 81.) Zhang's decision to remove PPG's logo was not random. Instead, it was her response to Rukavina's warning earlier in the day that "[t]he drawings are labeled 'PPG Proprietary' so my guess is that [AKI] will not make them for us." (*Id.*)

322–23. Zhang and TMG reached into Pennsylvania to misappropriate PPG's trade secrets through their communications with Rukavina and AKI. So exercising jurisdiction over those Defendants for PPG's claim is a proportional and foreseeable outgrowth of those contacts.

As for the third prong—whether exercising jurisdiction over Zhang and TMG comports with fair play and substantial justice—Defendants barely make an argument. Since the burden for this prong rests with Defendants, that silence is telling. In the Court's estimation, none of the factors outlined by our Court of Appeals and the Supreme Court affirmatively tilt in Zhang and TMG's favor. *See id.* at 324 (first citing *Burger King*, 471 U.S. at 477; then citing *Asahi*, 480 U.S. at 113). The burden on Zhang and TMG to defend in Pennsylvania is either neutral or tilts in PPG's favor. While Zhang is an individual, TMG is a corporation with enough money that it could wire over $100,000 to Rukavina to steal PPG's proprietary information. And the fact that TMG first hired a law firm to engage with this lawsuit back in 2015 further demonstrates its ability to litigate in this District. (ECF No. 136-1, at 92.) So it is reasonable to make TMG defend in this forum. In addition, Pennsylvania has a substantial interest in adjudicating the dispute in its courts. Zhang and TMG directed their intentionally tortious conduct at Pennsylvania, to harm a Pennsylvania-based company, using bank accounts located in Pennsylvania, communicating with AKI and Rukavina in Pennsylvania, and violating Pennsylvania's trade secrets statute.

Moreover, PPG has an interest in an efficient and convenient resolution of its claim. While PPG is surely capable of litigating elsewhere, it is entitled to pick its forum to an extent. Likewise, the judicial system's interest in efficiency and the international interests in this case are at best neutral for Zhang and TMG. In the Court's estimation, there is little sense in forcing this Pennsylvania-centric dispute to be resolved anywhere other than Pennsylvania. All this is to say that Zhang and TMG cannot make a compelling case that the third prong counsels against this

Court exercising jurisdiction over them.

After applying the traditional test, the Court concludes that it can exercise personal jurisdiction over Zhang and TMG consistent with Pennsylvania's long-arm statute and the United States Constitution.

### ii. _Benhua Wu_

Exercising jurisdiction over Benhua Wu under the traditional test is somewhat of a closer call. But in the end, the Court concludes that it can exercise personal jurisdiction over Wu.

As with Zhang, the Court's first step is to determine whether it can exercise personal jurisdiction over Wu in his individual capacity for tortious actions taken on behalf of his company, TMG. Wu's position as "General Manager" of TMG is analogous to that of a chief executive officer. So he is no doubt a senior officer at TMG. As for his direct contacts with Pennsylvania, PPG's exhibits show that they are relatively limited. But for the reasons explained below, the Court concludes those limited contacts are sufficient to justify the exercise of personal jurisdiction over him. Finally, Wu's emails to Rukavina and Zhang demonstrate his deep personal involvement in TMG's scheme to use Rukavina to steal PPG's trade secrets. For these reasons, so long as his contacts satisfy the traditional test, the Court can exercise jurisdiction over Wu in his individual capacity.

There is no question that Wu has far fewer direct contacts with Pennsylvania than Zhang. But in the Court's estimation, that is because Zhang acted as Rukavina's primary handler throughout TMG's scheme. Despite the limited number of direct communications between Wu and Rukavina, PPG's exhibits leave the Court convinced that Wu personally oversaw Zhang's actions. During Zhang and Rukavina's February 2015 dispute, Rukavina threatened to go over Zhang's head to Wu. (_Id._ at 77.) Zhang quickly emailed Rukavina back that "[a]ll of [her] actions

are controlling [sic] by Mr. Wu. He knows everything on our project status." (*Id.*)

PPG's other exhibits show that Zhang's statement about Wu's involvement in the scheme was likely not bluster. (*Id.* at 6, 14–17, 20, 89.) When Zhang needed TMG to transfer money to pay Rukavina, she went directly to Wu. (*Id.* at 14–17.) In early February 2015, right around the time Zhang made her first contact with AKI, Zhang emailed Wu a spreadsheet showing amounts paid and owed to Rukavina for his role in the misappropriation scheme. (*Id.*) Within a day Wu replied approving the money transfer to Zhang's account to pay Rukavina. (*Id.*)

This is not to say that Wu had no direct contact with Pennsylvania during the scheme. In early March 2015, Rukavina emailed Zhang asking her to pay him for his services during that January and February. (*Id.* at 20.) Zhang replied telling Rukavina that TMG would "pay Jan and Feb at [sic] soon. Hope within one week." (*Id.*) The same day Zhang sent her email to Rukavina, Wu sent an email to Zhang and carbon copied Rukavina telling Zhang to "[p]lease take care of [paying Rukavina] right away." (*Id.*) This Court knows of no reason why it should treat Wu's carbon copy email to Rukavina—located in Pennsylvania—as anything other than a contact between Wu and Pennsylvania. *See Grand Entm't Grp.*, 988 F.2d at 482 (holding that mail and phone calls count as contacts). In fact, the nature of that email from Wu to Rukavina is analogous to the contacts in *O'Connor*. There, the Third Circuit held that when the defendant hotel mailed newsletters after the plaintiffs' first stay and brochures ahead of their second stay to the plaintiffs' home in Pennsylvania, the hotel created contacts with the forum. *See O'Connor*, 496 F.3d at 315–16. Here, Wu's email to Rukavina, like the hotel's mail to the plaintiffs in *O'Connor*, was an intentional effort to reach into Pennsylvania to target its citizen. *See id.* And the Supreme Court has made it abundantly clear that the purposeful availment prong is not a numbers game. *See Burger King*, 471 U.S. at 475 n.18. Instead, even a single contact with the forum can satisfy the

traditional test's first prong so long as it creates a substantial connection to the forum. *Id.* In the Court's estimation, even if Wu's broader involvement in the misappropriation scheme could not count toward the purposeful availment inquiry, his email to Rukavina is enough to establish the first prong.

As for the traditional test's relatedness prong, the Court's discussion for Wu mirrors its discussion of Zhang and TMG. Wu's contact with Pennsylvania, through his email to Rukavina arranging for Rukavina's payment in furtherance of TMG's scheme, obviously relates to PPG's trade secrets claim. Rather than some wholly unrelated contact with Pennsylvania, Wu's email to Rukavina gets to the heart of the matter in this case: TMG's trade secrets-for-cash arrangement with Rukavina. Thus, the Court has no difficulty concluding that PPG established the traditional test's second prong.

The traditional test's third prong applies to Wu in much the same way it applied to Zhang and TMG. PPG's interest in litigating in Pennsylvania, Pennsylvania's interest in adjudicating this dispute, and the international system's interest in the case are all the same for Wu as those factors were for Zhang and TMG. The only factor that requires a separate inquiry from the Court's earlier discussion of the third prong is the burden on Wu if required to litigate in Pennsylvania. Wu is an individual defendant. But he is also the CEO of a corporation being held liable for corporate-related actions, so this case presents something different than simply Wu-the-individual being haled into Pennsylvania's courts. And the Court must balance Wu's burden against all of the other factors outlined by the Third Circuit and Supreme Court. In the Court's estimation, that balance does not counsel against exercising personal jurisdiction over Wu. Defendants did not present a compelling case that the third prong counsels in Wu's favor.

As with Zhang and TMG, the Court can exercise personal jurisdiction over Wu in a manner

consistent with Pennsylvania law and due process. For completeness, however, the Court will apply the *Calder* effects test to Zhang, Wu, and TMG.

**B. *Calder* Effects Test**

In *Calder v. Jones*, the Supreme Court provided an additional personal jurisdiction test that applies to intentional tort claims—often referred to as the *Calder* effects test. 465 U.S. at 783. At times, our Court of Appeals has called the *Calder* effects test as "[a] slightly refined version of [the traditional test that] applies to intentional tort claims. *See O'Connor*, 496 F.3d at 317 n.2 (citing *Calder*, 465 U.S. at 783).

*Calder* involved a defamation claim brought by actress Shirley Jones against a National Enquirer reporter and editor in California state court over an allegedly libelous story. 465 U.S. at 784–87. Both the reporter and editor worked in Florida and neither stepped foot in California during their reporting for the story. *Id.* The only contact with California occurred when the reporter made a handful of phone calls in the process of gathering information for the story; the editor lacked any contacts with California. *Id.* Despite the dearth of direct contacts with California, the Supreme Court held that California's courts could exercise specific jurisdiction over both the reporter and editor. *See id.* The Supreme Court pointed to the fact the story relied on California sources and that Jones felt the brunt of the harm in California. *Id.* at 788–90. So California was "the focal point both of the story and of the harm suffered." *Id.*

But, in establishing the effects test, the Supreme Court imposed important limiting principles. For starters, the basis for the Court's reasoning in *Calder* only makes sense for intentional torts. So negligence or contract claims, for example, fall outside *Calder*'s holding. The Court also noted that the reporter and editor "expressly aimed" their tortious conduct at California. *Id.* And the Supreme Court noted that "they knew that the brunt of [Jones's] injury would be felt

by [her] in" California. *Id.* at 789–90.

In *IMO Indus., Inc. v. Kiekert AG*, the Third Circuit extended the *Calder* effects test to business torts, and in doing so articulated a three-part framework for applying *Calder*'s holding. 155 F.3d 254, 260–66 (3d Cir. 1998). As applied by our Court of Appeals, the *Calder* effects test requires plaintiffs to show:

1. The defendant committed an intentional tort;

2. The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]

3. The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Id.* at 265–66 (footnote omitted).

Because trade secret misappropriation claims sound in intentional tort, such claims easily satisfy the *Calder* effects test's first prong. *See, e.g.*, *GEICO v. Nealey*, 262 F. Supp. 3d 154, 163–66 (E.D. Pa. 2017). As for the second prong, trade secrets are located, so to speak, in the state where their owner resides. *See Paolino v. Channel Home Ctrs.*, 668 F.2d 721, 721 n.2 (3d Cir. 1981). So a corporate plaintiff feels the brunt of the harm from misappropriation "in the states where the trade-secret owner is incorporated or headquartered." *GEICO*, 262 F. Supp. 3d at 166; *see also, e.g.*, *Eddie Kane Steel Prods., Inc. v. Ala. Plate Cutting Co.*, No. 18-cv-15167, 2019 WL 3281623, at *5–6 (D.N.J. July 19, 2019).

The *Calder* effects test's third prong involves a more granular inquiry than the first two (2) prongs. To establish *Calder*'s final prong, "the defendant must manifest behavior intentionally targeted at and focused on" the forum state. *IMO Indus.*, 155 F.3d at 265 (quoting *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)) (internal quotation marks omitted). In other

words, "the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum." *Id.* at 266. To do so, the plaintiff must "point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* Without these intentionality restrictions, *Calder* would always allow the plaintiff to sue in its home state. *See id.* at 264–66.

There are several illustrative cases from district courts in our Circuit that apply the *Calder* effects test to trade secret misappropriation claims. In *Cabot Corp. v. Niotan, Inc.*, Judge Gardner applied the Third Circuit's three-pronged test. No. 08-cv-01691, 2011 WL 4625269, at *14–16 (E.D. Pa. Sept. 30, 2011). For the third prong, Judge Gardner quoted a Southern District of Iowa opinion, saying that the "physical act of theft is certainly aimed at the place of the theft, but the reasonable expectation and understandings in the mind of the thief is that he takes something that belongs to someone else and that the *effect* of his theft will be where that someone is located." *Id.* at *15 (quoting *EFCO Corp. v. Aluma Sys., USA, Inc.*, 983 F. Supp. 816, 823 (S.D. Iowa 1997)). So "the focal point of where [the] defendant directed its activities is where [the] plaintiff's trade secrets are located and from where they were presumably stolen." *Id.*

In a District of New Jersey decision, Judge Shipp followed *Cabot Corp.*'s lead when it came to implementing *Calder*'s third prong for trade secrets misappropriation claims. *See Eddie Kane Steel Prods., Inc.*, 2019 WL 3281623, at *6. There, Judge Shipp wrote that "if a defendant steals trade secrets from a plaintiff, the defendant expressly aims his or her tortious activity at the state where the plaintiff resides, and the plaintiff has felt the brunt of the harm in that state." *Id.* And because the defendant in that case knew the plaintiff was located in the forum state, the plaintiff met *Calder*'s third prong. *Id.* at *7.

Judge Bartle similarly implemented *Calder*'s third prong for a trade secrets claim in *Vizant*

*Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 632 (E.D. Pa. 2015). There, Judge Bartle found *Calder*'s third prong met because, "to the extent that defendants misappropriated the trade secrets of [plaintiff] in violation of [statute], this conduct was 'expressly aimed' at causing harm to an entity which defendants knew was headquartered in Pennsylvania." *Id.* And therefore the defendants knew the harm from misappropriation would occur in Pennsylvania. *Id.* In other words, "defendants not only knew that their conduct would cause harm to an entity located in Pennsylvania, but also engaged in that conduct intentionally, with the goal of causing said harm." *Id.*

Here, for the *Calder* effects test's first and second prongs, the Court can combine all Defendants into the same analysis. And the Court concludes that PPG easily establishes the *Calder* effects test's first two (2) prongs. PPG claims that Defendants misappropriated its trade secrets, in violation of PUTSA. And because trade secrets misappropriation is an intentional tort, PPG established the first prong. As for the second prong, there is no doubt that PPG maintains its headquarters in Pittsburgh, Pennsylvania. So it follows that PPG's trade secrets are located, so to speak, in Pennsylvania. *See Paolino*, 668 F.2d at 721 n.2. For the *Calder* effects test's final prong, similar to the approach taken during the traditional test inquiry, the Court will examine Wu separate from Zhang and TMG.

### i. *Mei Zhang and TMG*

For the same reasons discussed during the Court's traditional test inquiry, the Court can examine the *Calder* effects test's third prong for Zhang and TMG at the same time. PPG must point to specific activity indicating that Zhang and TMG expressly aimed their tortious conduct at Pennsylvania. *See IMO Indus.*, 155 F.3d at 266. Zhang, and therefore TMG, no doubt knew that their actions would harm PPG in Pennsylvania—the state that Pennsylvania law designates as the

situs for PPG's trade secrets. *Accord Paolino*, 668 F.2d at 721 n.2. After all, Zhang knowingly and intentionally removed the PPG logo from the stolen proprietary documents before sending them to AKI. (ECF No. 136-1, at 81.) That attempt at concealment demonstrates intentionality, just as taking the proprietary information in the first place demonstrates theft.

The three (3) Eastern District of Pennsylvania decisions that apply *Calder* to trade secrets claims all focus on the fact that thieves know their actions affect the owner wherever the owner is located. *See Eddie Kane Steel Prods., Inc.*, 2019 WL 3281623, at *6; *Vizant Techs.*, 97 F. Supp. 3d at 632; *Cabot Corp.*, 2011 WL 4625269, at *14–16. So the focal point of Zhang and TMG's intentionally tortious actions is Pennsylvania, because that is where PPG is located, and Zhang and TMG surely knew their conduct would harm PPG. As a result, PPG has established the *Calder* effects test's third prong—meaning that the Court can exercise jurisdiction over Zhang and TMG under both the traditional test and *Calder* effects test.

### ii.    *Benhua Wu*

Exercising jurisdiction over Wu using the *Calder* effects test presents less of a close call than the traditional test.[7] As Zhang stated in her email to Rukavina, Wu was in the loop on all of her and Rukavina's efforts to use PPG's proprietary information. (ECF No. 136-1, at 77.) And as the Court noted earlier, all of the exhibits provided by PPG suggest that Zhang meant it when she said Wu controlled the scheme. (*Id.* at 6, 14–17, 20, 89.) After all, Zhang had to go to Wu to get the sign off on paying Rukavina for his role in their scheme. (*Id.* at 14–17.) Wu's involvement in the scheme, like Zhang's, leaves the Court convinced that Wu acted with the knowledge and intent to misappropriate PPG's proprietary information. So he no doubt knew these actions would harm PPG, and because PPG's trade secrets are "located" in Pennsylvania, Wu's intentionally tortious

---

[7] For the same reasons stated during the traditional test inquiry, the Court can exercise jurisdiction over Wu in his individual capacity.

actions made Pennsylvania their focal point.

Here, exercising jurisdiction over Wu does not implicate the concerns voiced by our Court of Appeals in *IMO Indus.* about broad interpretations of *Calder*'s third prong. *See* 155 F.3d at 265–66. In *IMO Indus.*, the Third Circuit refused to allow a corporate defendant to invoke *Calder* to claim that it always feels the effects of an intentional tort at its principal place of business. *See id.* But trade secret claims are different than the sort of business tort that the Third Circuit addressed in *IMO Indus.* That is because trade secrets, the Third Circuit has held, are located where the owner of those secrets resides—in the case of a corporation, the state of incorporation and principal place of business. *See Paolino*, 668 F.2d at 721 n.2; *GEICO*, 262 F. Supp. 3d at 166. On the other hand, corporate contracts are not "located" in the same manner as trade secrets. Instead, corporate contracts are subject to the same state law as any other contract.

For example, a corporation incorporated and headquartered in Minnesota does not automatically get to litigate in Minnesota over a contract that it signed in New York, with a New York company, for services rendered in Connecticut. Tortious interference with that exemplar contract does not inherently make Minnesota the focal point of its harmful effects, even though the Minnesota corporation may very well feel some effects on its bottom line there. For trade secrets, however, the same is not true. In the trade secrets misappropriation context, it makes sense that the focal point of the effects is more likely to be the corporation's headquarters. And the act of intentionally misappropriating the corporation's trade secrets inherently involves harming the corporation where it keeps those secrets—i.e., its headquarters. *Cf. Eddie Kane Steel Prods., Inc.*, 2019 WL 3281623, at *6; *Vizant Techs.*, 97 F. Supp. 3d at 632; *Cabot Corp.*, 2011 WL 4625269, at *14–16. So the limiting principal in *Calder*'s third prong really goes toward ensuring the defendant knew where the plaintiff would feel the effects of the tort. While this does not guarantee

that the plaintiff corporation can sue where it is headquartered, neither does it necessarily prevent the plaintiff from bringing its intentional tort claim there. For Wu, this means that PPG felt the effects of his intentional tort in Pennsylvania, and that Pennsylvania was, in fact, the focal point of his scheme.

In the end, the *Calder* effects test allows the Court to exercise jurisdiction over Zhang, TMG, and Wu consistent with due process and Pennsylvania's long-arm statute. The same can be said under the Court's application of the traditional test. Therefore, both available personal jurisdiction frameworks support this Court deciding PPG's claim. Defendants' Motion to Set Aside the Default is denied.

### III.   PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT & INJUNCTION

PPG moves the Court for a default judgment. As part of this motion, PPG seeks monetary and exemplary damages for Defendants' trade secrets misappropriation. In addition, PPG seeks a permanent injunction preventing Defendants from using the misappropriated trade secrets and ordering Defendants to return that information to PPG. For the reasons that follow, PPG's motion is granted in part and deferred in part without prejudice.

Courts in our Circuit decide default judgment motions using a familiar two-step framework. First, the court should "ascertain whether 'the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Serv. Emps. Int'l Union Local 32BJ, Dist. 36 v. ShamrockClean, Inc.*, 325 F. Supp. 3d 631, 635 (E.D. Pa. 2018) (quoting *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008)). To complete this first step, the Court should accept as true all factual allegations contained in the complaint, except those concerning the amount of damages. *See DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 n.6 (3d Cir. 2005). That is to say, the Court should start by determining whether the

plaintiff alleged sufficient facts that, treated as true, justify the plaintiff's requested relief.

Second—even if the first step suggests that the Court should grant the plaintiff relief—a default judgment is only appropriate where: (1) denying the default would prejudice the plaintiff; (2) the defendant lacks a litigable defense; and (3) the defendant's delay in responding to the plaintiff's allegations is due to the defendant's culpable conduct. *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000). The Court must consider the *Chamberlain* factors because Third Circuit case law disfavors default judgments to decisions on the merits. *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988).

A. **PUTSA Liability**

Although its Complaint included several claims, PPG only seeks a default judgment on its PUTSA misappropriation claim. Under Pennsylvania law, "[a] person has misappropriated a trade secret . . . when he acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010) (citing 12 Pa. Cons. Stat. § 5302). Whether information constitutes a trade secret under Pennsylvania law is a question of fact. *See Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009). Because Defendants' default admits all of the facts alleged in PPG's Complaint, PPG easily establishes its trade secrets claim.

The first step in the Court's liability inquiry is to determine whether the information at issue in this case constitute trade secrets. Pennsylvania law defines a trade secret as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by

proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302. Under PUTSA, manufacturing processes are protectible as trade secrets. *See Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 708 (E.D. Pa. 2014) (citing *Permagrain Prods., Inc. v. U.S. Mat & Rubber Co.*, 489 F. Supp. 108, 112 (E.D. Pa. 1980)). And reports that contain "a compilation of data" with "independent economic value can be protected as a trade secret." *See Youtie v. Macy's Retail, Inc.*, 653 F. Supp. 2d 612, 620–21 (E.D. Pa. 2009).

The well-pleaded facts in the Complaint and exhibits, accepted as true, leave the Court with no doubt that the information Rukavina gave to Defendants falls well within the statutory definition of a trade secret. As part of its default judgment motion, PPG attached a declaration from Brent Wright, PPG's Global Platform Director for Aerospace Transparencies.[8] (ECF No. 107-4.) In his declaration, Wright stated that, as part of this litigation, he reviewed the correspondence between Rukavina and Defendants. (*Id.* at 2.) From that review, Wright found that "Defendants conspired with Thomas Rukavina to obtain a broad array of PPG proprietary transparency-related manufacturing processes." (*Id.*) In particular, Wright's review identified the following proprietary information: (1) a PPG proprietary report ("Proprietary Report") detailing the manufacturing process for a new type of commercial aircraft window; (2) the casting of urethane and acrylic; (3) formulation of interlayer materials necessary for the lamination of multi-ply transparencies; (4) formulation of primer materials necessary to ensure or enhance the mutual adhesion of aircraft transparency plies; and (5) application of indium tin oxide coatings to plastics. (*Id.*) In addition, Wright's review of Defendants' correspondence with Rukavina found that

---

[8] In his declaration, Wright states that he worked with Rukavina and participated in the development of PPG's Opticor technology. (ECF No. 107-4, at 1–2.)

Defendants "retained engineers to design a facility layout for a brand new vertically integrated [TMG] aircraft window facility, complete with proposed casting layouts that indicate parameters for products identified in the Proprietary Report." (*Id.* at 3.)

In the Court's estimation, the materials identified by Wright are the sort of manufacturing processes and data compilations that Pennsylvania courts have found to be trade secrets. To determine if information is a trade secret, Pennsylvania courts consider several factors: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the plaintiff spent developing the information; and (6) the difficulty with which the information could be legitimately acquired or reproduced by others. *See Bimbo Bakeries*, 613 F.3d at 109.

The well-pleaded allegations in PPG's Complaint and facts deemed admitted via PPG's requests for admissions, show that the materials Defendants obtained from Rukavina fall within the statutory definition of a trade secret. (Compl., ECF No. 1, at ¶¶ 63–64.) According to FBI Special Agent Gregory Roth's application for a warrant to arrest Rukavina, attached as an exhibit to PPG's exemplary damages motion, PPG's Chief Technology Officer told the FBI that no other company in the market supplied the technology referenced in the Proprietary Report. (ECF No. 107-3, at 69.) PPG took extensive efforts to keep the information Rukavina gave to Defendants secret. These efforts included having Rukavina sign a series of confidentiality agreements, as well as reminding Rukavina about his confidentiality obligations at the end of his employment with PPG. (ECF No. 1, at ¶¶ 16, 18, 20–21.) And PPG labelled the Proprietary Report that Rukavina sent to Defendants as "PPG Confidential" on every page, so it was beyond clear that the

information was not for dissemination. (*Id.* at ¶ 27.)

PPG also took steps within its own organization to limit employee access to the trade secrets outlined in Wright's declaration. (*Id.* at ¶ 18–19; ECF No. 107-4.) Later in his tenure at PPG, Rukavina began working on "classified projects," which involved him signing a "Classified Projects Agreement." (ECF No. 1, at ¶ 18–19.) The Classified Projects Agreement gave Rukavina greater access to the Opticor trade secrets, but also imposed additional restrictions. (*Id.*) What's more, PPG spent millions of dollars to develop the Opticor technology that Rukavina gave to Defendants. (ECF No. 107-5.) In all, the factors outlined by the Third Circuit in *Bimbo Bakeries* show that the materials Defendants obtained from Rukavina constituted PPG's trade secrets. *See* 613 F.3d at 109.

The next step is to determine whether Defendants' conduct amounts to misappropriation. PUTSA defines two (2) types of misappropriation. First, misappropriation includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 12 Pa. Cons. Stat. § 5302. Misappropriation also includes "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." *Id.* And PUTSA further defines improper means as including, "but . . . not limited to, theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." *Id.*

Here, PPG's Complaint and exhibits establish both forms of misappropriation. (ECF No. 1, at ¶¶ 65–69.) First, the well-pleaded facts in PPG's Complaint, supported by the exhibits and requests for admissions, show that Defendants acquired PPG's trade secrets from Rukavina, knowing that Rukavina obtained them through improper means. For instance, Defendants

specifically asked Rukavina whether he signed a confidentiality agreement with PPG. (*Id.* at ¶ 23.) Despite Rukavina revealing that he had, Defendants still colluded with him to obtain PPG's trade secrets. (*Id.* at ¶ 24.) Moreover, the Proprietary Report that Rukavina provided to Defendants had "PPG Confidential" marked on each page. (*Id.* at ¶ 27.) So there is no way for Defendants to claim that they did not know Rukavina provided the documents in violation of his secrecy obligations. *See* 12 Pa. Cons. Stat. § 5302.

Second, Defendants also disclosed and used PPG's trade secrets after acquiring them through improper means. Zhang, with Wu's oversight, removed PPG's logo from confidential documents that Rukavina provided, and sent those documents to AKI, the PPG supplier. (*Id.* at ¶¶ 26–36, 69; Req. for Admis., ECF No. 107-3, at 26 (¶¶ 17–18).) In other words, despite their knowledge that Rukavina unlawfully obtained PPG's trade secrets, Defendants used and disclosed those secrets for their own gain. And Zhang told Rukavina in an email that preparations were underway at TMG to begin manufacturing products based on PPG's trade secrets. (ECF No. 136-1, at 77.) In short, Defendants' conduct amounts to misappropriation of PPG's trade secrets under Pennsylvania law. *See* 12 Pa. Cons. Stat. § 5302.

The conclusion that PPG established Defendants' liability under PUTSA leads the Court to its consideration of the *Chamberlain* factors. *See* 210 F.3d at 164. First, as the Court noted in its discussion of Defendants' motion to set aside the entry of default, Defendants' only stated merits defense is this Court's lack of personal jurisdiction. And the Court's decision that it has personal jurisdiction over all Defendants applies as much to Defendants' motion to set aside the default as it does to PPG's motion for default judgment. So Defendants wholly fail to establish the litigable defense *Chamberlain* factor. Second, denying the default judgment would prejudice PPG. Without a default judgment, PPG is left without any way to remedy Defendants' theft of its trade

secrets. *See Broad. Music, Inc. v. George Moore Enters., Inc.*, 184 F. Supp. 3d 166, 170 (W.D. Pa. 2016). And denying PPG's motion could cause further prejudice if evidence was lost in the years that elapsed before Defendants entered an appearance in this case. Finally, the default is the product of Defendants' culpable conduct. Defendants knew about this lawsuit back in 2015, evidenced by the fact that they hired a major U.S. law firm to engage PPG's counsel at that time, yet they never filed an Answer or anything else until years after the entry of default. (ECF No. 136-1, at 92.)

The bottom line is that PPG's well-pleaded factual allegations, requests for admissions, and exhibits—all taken as true in light of Defendants' default—establish Defendants' liability for misappropriation under PUTSA. And because none of the *Chamberlain* factors tilt in Defendants' favor, the Court will enter a default judgment on PUTSA liability against Defendants.

### B. **PUTSA Monetary Damages**

Because PPG established Defendants' liability for misappropriation under PUTSA, the Court must turn to the question of damages.[9] While the Court concludes that PPG's research and development costs provide an appropriate measure of Defendants' unjust enrichment, and therefore PPG's damages, the evidence now in the Record is not sufficiently specific to grant PPG's requested amount of damages, or more precisely, to calculate the amount of damages due to PPG. PPG's motion, on the issue of damages, is therefore deferred at this juncture without prejudice to PPG providing more detailed evidence as to its research and development expenses related to the trade secrets that Defendants misappropriated.

Under Pennsylvania law, "[d]amages can include both the actual loss caused by

---

[9] In contrast to PPG's factual allegations about liability, the Court is not permitted to treat allegations going to the calculation of damages as admitted by the Defendants' default. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 12 Pa. Cons. Stat. § 5304(a). The use of the conjunction "and" in the PUTSA damages provision gives courts a degree of flexibility in determining damages— both actual loss by the plaintiff and unjust enrichment by the defendant can be included in the damages figure, so long as there is no double counting.

PPG seeks a damages award of $9,909,687.31. (ECF No. 107, at 17.) PPG does not present the Court with evidence that it suffered lost profits—i.e., actual loss—from Defendants' misappropriation. Instead, PPG argues that Defendants were unjustly enriched by their misappropriation of PPG's trade secrets. The basic premise of PPG's argument is that, by unlawfully obtaining PPG's trade secrets from Rukavina, Defendants gained a benefit that they were not entitled to, and that permitting them to retain that benefit would result in an injustice. When it comes to unjust enrichment, PUTSA's text does not mandate a particular method for valuing a defendant's gains from misappropriation. Yet there is considerable case law, in Pennsylvania and elsewhere, on how courts should value a defendant's unjust enrichment. And because Pennsylvania courts use the Restatement (Third) of Restitution and Unjust Enrichment as a valuable guiding source, this Court is entitled to do the same. *See Mifflinburg Tel., Inc. v. Criswell*, 277 F. Supp. 3d 750, 802 (M.D. Pa. 2017) (citing *D.A. Hill Co. v. Clevetrust Realty Inv'rs*, 573 A.2d 1005, 1009 (Pa. 1990)).

PPG suggests that the Court should measure Defendants' unjust enrichment by the research and development costs that Defendants would have incurred had they legitimately developed the same technology as PPG, rather than unlawfully acquiring it from Rukavina. (ECF No. 137, at 3–6.) And PPG suggests that its own research and development expenses for the stolen trade secrets provide an acceptable proxy for measuring the magnitude of those expenses Defendants would

have incurred. (*Id.*) Defendants, on the other hand, vigorously argue that a plaintiff's research and development costs are not an acceptable means of measuring a defendant's unjust enrichment under PUTSA. The Court disagrees.

Under the Restatement of Restitution and Unjust Enrichment, when a plaintiff cannot show lost profits caused by misappropriation or point to the defendant's profits attributable to the misappropriation, the defendant is liable to the plaintiff for the amount of benefit unlawfully obtained. *See* Restatement (Third) of Restitution and Unjust Enrichment § 42 cmt. f, illus. 5 (Am. Law Inst. 2011). In such cases, "[t]he value of the [defendant's] use may be measured, as the court finds appropriate, . . . by the costs that [the defendant] would have incurred to acquire or create equivalent materials by legitimate means." *Id.* "Use," in terms of trade secrets misappropriation, is broadly defined in the Restatement of Unfair Competition. *See* Restatement (Third) of Unfair Competition § 40 cmt. c (Am. Law Inst. 1995). As the Reporters for the Restatement put it, "[a]s a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' . . . . Thus, . . . relying on the trade secret to assist or accelerate research or development . . . constitute[s] 'use.'" *Id.* At least for the Restatement of Unfair Competition and Restatement of Restitution and Unjust Enrichment, then, PPG's use of development costs is a viable means of measuring Defendants' unjust enrichment.

While the parties have not identified a PUTSA misappropriation case that uses a plaintiff's research and development costs to measure a defendant's unjust enrichment, other courts interpreting similar uniform trade secrets statutes have approved of that approach. In *Wellogix, Inc. v. Accenture, L.L.P.*, the Fifth Circuit, interpreting the Texas Uniform Trade Secrets Act, noted that misappropriation damages can take several forms. *See* 716 F.3d 867, 879 (5th Cir. 2013) (quoting *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012)). Employing a flexible

approach, the Fifth Circuit approved of using the plaintiff's expenses to develop a trade secret as a way to measure the benefit the defendant achieved by misappropriating that trade secret. *See id.* at 879–81.

Defendants attempt to distinguish *Wellogix* by arguing that the defendants in that case used the stolen trade secrets, whereas Defendants here did not. The Record contradicts Defendants' claim that they did not use PPG's trade secrets. Not only did TMG begin configuring a factory to put PPG's trade secrets to work, Zhang used PPG's information and technology when she reached out to AKI in order to obtain PPG's proprietary molds. (ECF No. 1, at ¶¶ 26–36, 69; Req. for Admis., ECF No. 107-3, at 26 (¶¶ 17–18); ECF No. 136-1, at 77.) So there is plenty of evidence that Defendants' conduct amounted to "use" of the stolen PPG trade secrets.

PPG and Defendants also take contrary positions on the import of an unpublished Eastern District of Pennsylvania decision that discusses the use of development costs to measure misappropriation damages under PUTSA. In *HealthCare Advocates v. Affordable Healthcare Options*, the district court rejected the plaintiff's request to use research and development expenses as a measure of damages from the defendant's misappropriation. No. 09-cv-5839, 2010 WL 4665956, at *2 (E.D. Pa. Nov. 18, 2010). But there, unlike here, the plaintiff only invoked a lost profits theory of damages—meaning that the plaintiff relied on the "actual loss" prong of PUTSA's damages provision. *Id.* ("[T]he cost of developing the trade secrets bears no obvious relationship *to the amount of profits lost* as a result of the misappropriation." (emphasis added)). In fact, the district court specifically noted that the plaintiff did not invoke PUTSA's unjust enrichment prong. *See id.* at *2 n.2. Whether a plaintiff's research and development costs are an acceptable means of measuring the plaintiffs lost profits is a different question from whether those same costs are an acceptable way to measure the defendant's gains. PPG's motion only calls on the Court to decide

the latter. So *HealthCare Advocates*'s disapproval of the former is largely irrelevant.

In the Court's estimation, considering the costs PPG expended to develop the technology the Rukavina sold to Defendants is an appropriate way to measure Defendants' unjust enrichment. After all, the communications between Zhang and Rukavina strongly suggest that Defendants' goal in colluding with Rukavina was to significantly shorten the time it would take for them to manufacture products that could compete with PPG. And as Rukavina put it early on in his communications with TMG, Benhua Wu was "getting 10 years of R&D" in the form of PPG's proprietary information. (ECF No. 137-1, at 3.) Defendants were not just buying a product from Rukavina, they were buying time. So it makes perfect sense to consider the time and money PPG spent developing the misappropriated trade secrets when the Court decides how much Defendants benefited from stealing those secrets.

Defendants argue that because they never used the stolen secrets to manufacture a finished product, they did not actually obtain any benefit from Rukavina's information. This argument lacks merit. Imagine, for example, that there was a soda pop manufacturer located in Atlanta, Georgia that spent time and money to develop the world's most popular soda pop recipe, then spent considerable effort to keep that recipe super top-secret. If a competing soda pop manufacturer stole the secret, but never actually produced any soda pop from the world-famous recipe, the thief still obtained an actual benefit—a really big benefit. After all, the recipe, in and of itself, has immense value. And the competing manufacturer would have acquired the ability to use the world-famous and top-secret recipe whenever it wanted, without having to spend a dime of R&D costs, or a moment of R&D time. The competitor plainly would have been enriched in the amount of R&D that it never had to do.

Accepting Defendants' damages arguments would also raise serious incentive concerns.

Defendants repeatedly tell the Court that PPG cannot prove that Defendants ever put the stolen trade secrets to work—i.e., used the stolen information to manufacture a product or solicit commercial deals. While the Court agrees that PPG has not (yet) established that Defendants used the trade secrets to manufacture any products, that is not the same as saying Defendants actually did not do so. There is substantial uncertainty as to what Defendants did with the stolen PPG trade secrets. That uncertainty remains to this day because Defendants steadfastly refused to participate in this litigation until the final hour, and then only to attack the default. Defendants' refusal to participate deprived PPG of the opportunity to engage in discovery that could have shed light on Defendants' broader conduct. Crediting Defendants' late-arriving arguments would incentivize parties to refuse to participate in litigation on the merits, thus depriving the plaintiff of a fair shot to uncover relevant information during discovery, then claim that because the plaintiff cannot tell the Court information that only the defendant is likely to know, the plaintiff must get nothing. Such an argument runs completely counter to the purpose of modern civil litigation, common sense, or substantial justice.

After engaging in a long-running scheme to steal and cheat, Defendants come to the table with unclean hands. Now they try to deploy procedure and word play to evade the consequences of their actions. Defendants gained considerable value from having in their hands, unclean as they are, the secrets they stole from PPG, and PPG makes a persuasive case that it is well past time for Defendants to pay up. Unjust enrichment provides the Court with a remedy and method of damages calculation that is flexible enough to capture and value the harm flowing from Defendants' conduct. And in the Court's estimation, PPG's suggestion to use its development costs for the stolen secrets as the measuring stick provides a rational and proportional means to quantify the remedy for Defendants' wrongs.

With that said, at this juncture the Court believes that PPG has not yet established its research and development costs to a sufficient degree of specificity. When the amount of damages is not for a sum certain, such as liquidated or statutory damages, the plaintiff must present sufficient evidence to establish the damages amount. *See* Fed. R. Civ. P. 55(b). Here, PPG's claim is not for a sum certain, so it has the burden of establishing its damages to a reasonable degree of specificity. *See Comdyne I, Inc.*, 908 F.2d at 1149. The only evidence in the Record related to damages is an affidavit by PPG's Global Director of Engineering and Technology, Khushroo Lakdawala ("Lakdawala Declaration"), attached as an exhibit to PPG's default judgment motion. (ECF No. 107-5.) The Lakdawala Declaration includes a one-page spreadsheet purporting to show PPG's research and development expenses for the trade secrets Defendants misappropriated. (ECF No. 107-5, at 6.) In total, the Lakdawala Declaration claims that PPG spent $9,909,687 on relevant research and development. For a number of reasons, the Lakdawala Declaration is not detailed enough for the Court to grant the nearly $10 million in requested damages based on it alone.

First, the averments and spreadsheet in the Lakdawala Declaration do not leave the Court sufficiently convinced that the expenditures included in PPG's damages figure relate solely to the trade secrets Defendants misappropriated. The Court's concern, here, is due in part to the fact that PPG uses the Wright Declaration (ECF No. 107-4) to establish that the stolen information constituted a trade secret under PUTSA, and the Lakdawala Declaration (ECF No. 107-5) to establish the value of those secrets, but neither declaration references the other. While it might be that both declarations wholly align, the Court needs some more detail.

Second, the Lakdawala Declaration relies on several estimated costs, but does not adequately explain how it reached those estimations. For instance, the spreadsheet includes estimated development costs for 2004 and 2005—$200,000 and $300,000, respectively. (*Id.*)

Beyond claiming that those are conservative estimates, PPG does not explain why the Court should credit those "round number" approximations. (*Id.* at 3.) The same goes for the labor costs associated with developing the Opticor technology. The Lakdawala Declaration states that employee time was not tracked by the project. (*Id.*) It then lists the names of several employees who worked on the Opticor development team and estimates the number of hours they spent working on Opticor research. (*Id.* at 3, 6.) PPG then multiplies the number of employee hours, 3323.2, by a flat rate, $80 per hour, to come up with an estimated labor cost of $265,856. (*Id.* at 6.) When one reads the Lakdawala Declaration, how PPG estimated the number of hours and hourly rate remains somewhat of a mystery.[10]

Third and finally, the Lakdawala Declaration includes the costs of two (2) capital expenditures: a "Max Machine, Optical ACT #RD-7015" that cost $737,853, and a "Zwick Material Testing Machine BDQ-FB010TN-Proline ACT# 0322-0012" that cost $46,989. (*Id.*) While the Lakdawala Declaration states that those capital expenditures played a role in the Opticor development, such a broad statement raises several more questions. If the capital expenditures included in the Lakdawala Declaration relate more to ongoing manufacturing and production of Opticor technology, rather than the initial development of that technology, then those expenses are not properly called "research and development" costs. And even if PPG made both capital expenditures in order to develop the Opticor technology, PPG would still need to explain how the costs of those pieces of capital investment provide a useful approximation of the benefit Defendants unjustly obtained through their misappropriation. After all, unlike the time and cost of developing the know how to make the Opticor technology, Defendants did not necessarily save

---

[10] The hourly rate estimate, $80 per hour, is particularly troublesome since PPG applies that hourly rate to all labor over a twelve-year period. (ECF No. 107-5, at 6.) It strikes the Court as odd that PPG's employees' labor costs remained both uniform and stagnant over that time. And if the $80 per hour figure represents an average or adjusted amount, then PPG should show its work to a reasonable degree.

the costs of capital expenditures to make the stolen product.

None of this is to say that PPG is misleading the Court, but only to say that the information currently in the Record lacks the degree of specificity necessary to award damages, especially given the substantial dollar amounts involved in this case. Despite the Court's outstanding questions, PPG's task of supplying more detailed evidence of damages should not be too arduous. The Court already concluded that PPG's research and development expenses are at least one rational, useful, and appropriate way to measure Defendants' unjust enrichment. Now, PPG simply needs to back up its damages calculation in a way that allows the Court to scrutinize its calculations in more detail. In an effort to speed up the overall resolution of this process, the Court will send the parties to mediation on the issue of damages. The Court's hope is that mediation will allow the parties to resolve easy damages issues before the Court approves a final calculation. The Court remains the final voice on PPG's damages, but with the thorny legal issues resolved, mediation on the damages amount should allow for an efficient conclusion to this case. For these reasons, PPG's motion is deferred for the time being, and without prejudice, on the issue of damages.

## C.  PUTSA Exemplary Damages

Under PUTSA, "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under [the monetary damages section]." 12 Pa. Cons. Stat. § 5304(b). PPG asks the Court to grant it exemplary damages in the maximum amount allowed under Pennsylvania law—twice its monetary damages award. Pennsylvania courts consider "the duration of misappropriative conduct, the defendant's consciousness of resulting injury, and any efforts to cover up malfeasance" as factors to determine whether a defendant acted willfully and maliciously. *See Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 493 (M.D. Pa. 2018). Because the Court concludes that Defendants' acted in such

a nakedly unlawful manner to misappropriate PPG's trade secrets, the Court will grant PPG's request for the maximum exemplary damages.

During its personal jurisdiction and liability analysis, the Court already recounted many of Defendants' nefarious acts to misappropriate PPG's trade secrets. So the Court will not repeat every fact alleged in PPG's Complaint—all of which Defendants admitted through default—since the Court considered the entire Record in reaching its exemplary damages decision. With that said, in support of the exemplary damages award, there are three (3) particularly willful and malicious acts that the Court feels obligated to highlight.

First, Defendants knew Rukavina was under confidentiality agreements with PPG when they recruited him to provide PPG's trade secrets. In early 2013, Defendants reached out to Rukavina about his relationship with PPG and ability to provide information about certain PPG technology. (ECF No. 107-3, at 67.) In that email, a TMG representative asked Rukavina whether he signed "any type of confidential agreement and/or non-competitive agreement with PPG." (*Id.*) The TMG representative also asked whether "the technology used [sic] which will be used . . . violating [sic] PPG's [intellectual property]." (*Id.*) Rukavina responded: "When you join and when you leave PPG you are forced to sign these documents. Of [sic] you follow these documents as written you could never work again. . . . I think I made my point!!" (*Id.*; ECF No. 1, at ¶¶ 23–25.)

Despite Rukavina making clear that he signed a confidentiality agreement with PPG in 2013, Defendants spent two (2) years pushing Rukavina to hand over more-and-more of PPG's intellectual property. In 2014, TMG flew Rukavina to Michigan and California to meet with Zhang and Wu. (ECF No. 1, at ¶ 28.) In those meetings, Defendants and Rukavina discussed the materials and equipment that TMG would need to obtain to begin manufacturing new products based on the

stolen PPG trade secrets. (*Id.*) Then, in June 2014, Defendants had Rukavina send them the PPG Proprietary Report and other trade secrets outlined in the Wright declaration. (*Id.* at ¶¶ 29–30.) Throughout this period, Defendants routinely transferred tens of thousands of dollars to Rukavina for his stolen secrets. (ECF No. 136-1, at 23–72.) Defendants knew Rukavina could not legally provide the coveted information, yet they continued to press him for more. *See Advanced Fluid Sys., Inc.*, 295 F. Supp. 3d at 493 (noting "duration of misappropriative conduct" as a factor in considering whether exemplary damages under § 5304(b) are appropriate).

Second, Defendants pushed Rukavina to provide more information and assistance even though the information he initially provided was marked "PPG Confidential." Defendants obtained a stolen copy of the Proprietary Report in June 2014. (ECF No. 1, at ¶ 29.) Every page in that report was marked "PPG Confidential." (*Id.* at ¶ 27; ECF No. 107-3, at 68–69 & nn.4–5.) And according to Special Agent Roth's arrest warrant application, PPG marked several pages in the Proprietary Report as restricted under U.S. International Traffic in Arms Regulations ("ITAR"). (ECF No. 107-3, at 69 & n.5.) The ITAR warning stated: "This document contains technical data controlled under [ITAR], and may not be exported or transferred to any Foreign Person . . . or foreign entity, by any means, without prior written approval from the U.S. Department of State . . . and PPG Industries, Inc." (*Id.* at 69 n.5.)

Zhang and Wu, as foreign nationals, and TMG, as a foreign entity, fall squarely within the category of individuals and entities covered by the ITAR warning included in the Proprietary Report. And obviously Zhang, Wu, and TMG did not seek PPG or the United States Government's permission before acquiring the Proprietary Report from Rukavina. But even after receiving the Proprietary Report plastered with unambiguous warnings, Defendants continued to work with Rukavina to obtain and use more of PPG's confidential information. (ECF No. 1, at ¶¶ 30–36; ECF

No. 107-3, at 26 (¶¶ 37–50).) For instance, after receiving the Proprietary Report, Defendants arranged for Rukavina to travel to California to obtain additional PPG trade secrets. (ECF No. 1, at 29 (¶ 38).) And in March 2015, Defendants arranged for Rukavina and a TMG employee to travel to Jiangsu, China to provide even more of PPG's information. (*Id.* (¶ 39).) The Proprietary Report put Defendants on notice as to PPG's interest in the information remaining confidential, but that did nothing to stop Defendants' illegal scheme. *See Advanced Fluid Sys., Inc.*, 295 F. Supp. 3d at 493 (noting "defendant's consciousness of resulting injury" as a factor in considering whether § 5304(b) exemplary damages are appropriate).

The final action the Court feels bound to highlight is perhaps the most willful and malicious. In early February 2015, Zhang emailed Rukavina with a link to AKI's website and asked whether Rukavina thought she should contact AKI about the molds it manufactured for PPG. (ECF No. 136-1, at 75.) That same day, Rukavina emailed Zhang: "The drawings are labeled 'PPG Proprietary' so my guess is that they will not make them for us[.] Someone else may." (*Id.*; ECF No. 1, at ¶ 38.) But that did not stop Zhang from reaching out to AKI in hopes of obtaining molds that AKI produced for PPG. Not letting the "PPG Proprietary" labels hold her back, Zhang emailed Rukavina: "I removed the logo of PPG and their company name from the pictures. Hope I did in a legal way. Just sent an email to the [AKI] purchasing manager. Let's wait [for] the feed back [sic] from him." (ECF No. 1, at ¶ 39; ECF No. 136-1, at 81.)

Zhang's efforts to conceal Defendants' scheme are naked in their illegality—"Hope I did [it] in a legal way." If only wishing made it so. It is hard to conjure up a more perfect example of willful and malicious misappropriation than knowingly pushing a company's angry former employee to breach multiple confidentiality agreements and provide stolen proprietary documents, removing the company's logo and other indicia from those stolen proprietary documents, then

using those stolen files in hopes of having one of the company's suppliers manufacture the proprietary technology outlined in the stolen files. Defendants' undeniable knowledge that the documents Rukavina provided were confidential PPG property shows willfulness. And Zhang's decision to remove PPG's logo from the files in a blatant attempt to conceal Defendants' unlawful scheme demonstrates malice. *See Advanced Fluid Sys., Inc.*, 295 F. Supp. 3d at 493 (noting that Pennsylvania courts consider "efforts to cover up malfeasance" when determining if, or in what amount, exemplary damages under § 5304(b) are appropriate); *B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 756–57 (W.D. Pa. 2007). Frankly, if Defendants' conduct does not warrant the maximum exemplary damages allowed under Pennsylvania law, then it would seem that nothing does.

The Court will grant PPG's motion for exemplary damages in twice the amount its monetary damages under 12 Pa. Cons. Stat. § 5304(a). Defendants' unlawful scheme lasted years, they knew their actions would harm PPG, and they tried to cover their tracks. *See Advanced Fluid Sys., Inc.*, 295 F. Supp. 3d at 493. In short, Defendants acted willfully and maliciously when they misappropriated PPG's trade secrets. Because, as the Court explained earlier, the amount of monetary damages is yet to be determined, the Court cannot assign the actual dollar value to exemplary damages today, but as a category, they are coming. Instead, the Court will approve an exact exemplary damages amount when it approves the final monetary damages amount.

### D.  Permanent Injunction

In its motion, PPG also seeks a permanent injunction to protect against Defendants' use or threatened use of the misappropriated trade secrets. The parties take conflicting positions on what legal standard the Court should apply in deciding whether a permanent injunction is appropriate. Defendants argue that the Court must apply the familiar federal standard outlined by the Supreme

Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). PPG points the Court to a nonprecedential Third Circuit decision, *Kenset Corp. v. Ilanjian*, that it says outlines the correct framework for issuing a permanent injunction under PUTSA. 600 F. App'x 827, 831 (3d Cir. 2015). Though the parties do not exactly tee up the issue as such, their disagreement over what injunctive relief standard applies essentially presents an *Erie* doctrine problem. *See Erie R.R. Co. v. Tomkins*, 304 U.S. 64 (1938).

*Erie* instructs that federal courts sitting in diversity must apply state substantive law and federal procedural law. *See id.* at 78. There is broad consensus that federal courts should always apply federal law for preliminary injunction decisions. *See* 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2943 (3d ed. 2019). But whether the law governing permanent injunctions is properly classified as procedural or substantive remains somewhat unclear. *See N.M. ex rel. Balderas v. Real Estate Law Ctr., P.C.*, 401 F. Supp. 3d 1229, 1351 n.93 (D.N.M. 2019) ("Some unclarity persists whether permanent injunctions involve state substantive law such that the court should apply state law standards."); *Waldschmidt v. NVR, Inc.*, No. 18-cv-1372, 2018 WL 6433910, at *11 n.9 (W.D. Pa. Dec. 7, 2018).

The trendlines, however, point to permanent injunctions being substantive law, therefore governed by state law. *See, e.g.*, *Real Estate Law Ctr., P.C.*, 401 F. Supp. 3d at 1351 n.93 (collecting dozens of cases across many circuits). This growing consensus makes good sense. Unlike a preliminary injunction, which simply maintains the status quo awaiting a decision on the merits, a permanent injunction is a decision on the merits. The bedrock principle behind *Erie* is that federal courts are duty bound to decide the merits of state law claims based on the applicable state's law. *See* Wright, et al., *supra*, §§ 2943, 4501. The Court agrees with its many sister courts that have held that state substantive law applies to the issuance of a permanent injunction. *See Real*

*Estate Law Ctr., P.C.*, 401 F. Supp. 3d at 1351 n.93. So Defendants' invocation of *eBay*'s general federal standard is not binding when the Court decides the injunctive relief portion of PPG's state law misappropriation claim.

There is also an important feature of this case that makes the Court's *Erie* decision somewhat simpler. PPG does not seek an injunction based on this Court's, or Pennsylvania state courts', general equitable powers. Instead, PPG bases its request for injunctive relief on a Pennsylvania statute. Under PUTSA, "[a]ctual or threatened misappropriation may be enjoined." 12 Pa. Cons. Stat. § 5303(a). PUTSA's injunction section also provides that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." *Id.* The fact that PPG relies on an express statutory right, rather than general principles of equity, solidifies the Court's conclusion that state law, not federal, must govern the permanent injunction determination.

While *Kenset Corp.* is nonprecedential, it is helpful. *See* 600 F. App'x at 831. There, our Court of Appeals interpreted § 5303(a) to require a four-part showing from the plaintiff in order to obtain a permanent injunction. *See id.*; *see also* 3 Melvin F. Jager, *Trade Secrets Law* § 56:5 (Oct. 2019 update). Under that test, the plaintiff must show "(1) the existence of a trade secret; (2) the communication of the trade secret pursuant to a confidential relationship; (3) the use or threatened use of the trade secret in violation of that confidence; and (4) harm." *Kenset Corp.*, 600 F. App'x at 831 (first citing 12 Pa. Cons. Stat. § 5303(a); then citing *Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 566 (3d Cir. 2003); then citing *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1232 (Pa. Super. Ct. 1989)). Though *Kenset Corp.*, like any other nonprecedential decision from our Court of Appeals, does not bind this Court, it does provide persuasive authority.

*See, e.g.*, *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F. Supp. 2d 526, 536 (M.D. Pa. 2006). And here, the Court finds *Kenset Corp.*'s reasoning persuasive.

PPG has little difficulty establishing the four-part PUTSA test outlined in *Kenset Corp.* First, as the Court has already concluded, the information that Defendants obtained from Rukavina were trade secrets under Pennsylvania law. (ECF No. 1, at ¶¶ 63–64; ECF No. 107-4.) Second, Defendants obtained PPG's trade secrets from Rukavina despite knowing that he signed confidentiality agreements with PPG. (ECF No. 1, at ¶¶ 16, 18, 20–21, 23–30; ECF No. 107-3, at 67.) Third, Defendants used and threaten to use PPG's trade secrets. Email correspondence between Rukavina and TMG representatives show that TMG planned to begin manufacturing products to compete with PPG using the stolen proprietary information. And Zhang sent some of the misappropriated information to AKI in an attempt to induce the PPG supplier to hand over more of PPG's proprietary technology. (ECF No. 1, at ¶ 39; ECF No. 136-1, at 81.) Finally, PPG established harm. TMG is one of PPG's competitors in the transparencies industry. And PPG was the only company manufacturing the Opticor technology that Rukavina provided to Defendants. PPG valued that technology at millions of dollars, and part of that valuation relied on PPG's ability to keep the technology secret. If Defendants were allowed to manufacture finished products based on the stolen technology and sell those products in direct or indirect competition with PPG, then PPG would suffer even greater harm. In short, PPG established the necessary elements to obtain a permanent injunction against Defendants under Pennsylvania's trade secrets statute.

In order to properly limit the scope of the injunction, only Defendants and certain associated individuals and entities—as defined in the Court's Order—are bound by its restrictions. As for the injunction's duration, PUTSA allows the injunction to remain in place until "the trade secret has ceased to exist." 12 Pa. Cons. Stat. § 5303(a). Consistent with other courts' application

47

of the PUTSA injunctive relief section, the injunction in this case will last until the trade secrets that Defendants' misappropriated cease to exist. *See* Jager, *supra*, § 56:5 (collecting PUTSA injunctive relief cases). In other words, the injunction is truly permanent.

## E.  Attorneys' Fees

The final task for the Court is addressing PPG's request for an award of attorney fees, expenses, and costs. Under PUTSA, "[a] court may award reasonable attorney fees, expenses and costs to the prevailing party . . . [if] willful and malicious misappropriation exists." 12 Pa. Cons. Stat. § 5305. In awarding exemplary damages, the Court already determined that Defendants willfully and maliciously misappropriated PPG's trade secrets. So what remains for the Court to decide, on the attorneys' fees issue, is whether PPG's fees, expenses, and costs are reasonable. Whether the rate charged by PPG's counsel is reasonable is a different question from whether counsel billed a reasonable number of hours. The question of counsel's billable rate requires the Court to examine the state of play at the front end of this litigation—i.e., the time when PPG needed to make a decision about what law firm to hire. On the other hand, when the Court examines the number of hours billed, the inquiry necessarily looks at the world as it stands when the trial court proceedings conclude.

### 1.  Reasonable Hourly Rate

In its filings and at oral argument, Defendants questioned whether PPG's decision to hire Washington D.C.-based attorneys from Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel") was a reasonable one.[11] PPG argues that the complexity of this case required specialized counsel with a national if not global reach, which therefore means a higher billable rate. Defendants argue

---

[11] PPG also retained Dentons Cohen & Grigsby P.C. to act as local counsel in this case. Defendants' reasonable rate arguments, however, relate primarily to Quinn Emanuel's hourly rate.

that the Court should apply the "forum rate rule," familiar in other fee shifting statutes. From the Court's review of the case law, it appears that Pennsylvania's courts have not yet clearly articulated a framework for PUTSA's fee shifting provision. Yet the Court concludes that the familiar "forum rate rule" that applies in other contexts, as well as the exceptions to that general rule, should apply to PUTSA's attorneys' fees provision as well.[12]

Our Court of Appeals best articulated the "forum rate rule" in *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.* (*ICO II*), 426 F.3d 694, 705 (3d Cir. 2005). Though that case involved a federal environmental statute, the Third Circuit's discussion of attorneys' fees statutes struck a broader tone. There, the Third Circuit adopted the "forum rate rule," holding "that, in most cases, the relevant rate is the prevailing rate in the forum of the litigation." *Id.* at 703–05 (citing *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 261 (1985)). Thus, in the ordinary case, if a court awards attorneys' fees, an out-of-forum attorney is only entitled to fees based on the prevailing rate in the forum. Yet the Third Circuit provided two (2) important exceptions to the "forum rate rule." *Id.* at 705. First is when the litigation requires "the special expertise of counsel from a distant district." *Id.* Second is when local counsel refuse to take the case. *Id.* PPG's fee request invokes the first exception to the forum rate rule.

Once Defendants challenged PPG's decision to hire counsel from outside the forum, the burden landed on PPG to show that its choice of counsel was necessary for this case. *Id.* at 705–06. It is not enough for PPG to demonstrate that the out-of-forum counsel that it hired possessed special expertise. *See id.* Instead, PPG must address whether suitable counsel in the forum possessed similar expertise. *See id.* ("The fact that [counsel from Washington D.C.] was suited to such representation does not imply that firms from northern New Jersey were not."). So PPG is

---

[12] Both PPG and Defendants, in general terms, agree that the "forum rate rule" applies, though neither addresses all of applicable aspects of that rule in this case.

responsible for showing not only that this case is complex, but that local counsel could not handle all of the issues involved.

The meat of Defendants' argument is that, as of right now, this case is simply one for stolen trade secrets under a Pennsylvania statute. That, they say, is not a complex case requiring specialized counsel from outside the forum. Thus, it would be unreasonable, according to Defendants, to stick them with PPG's above-market legal bill. But sort of like calling an aircraft carrier a "boat," Defendants' observation that this case "only" involves a PUTSA misappropriation claim is vastly underinclusive. And that argument incorrectly looks at this case's conclusion, rather than its beginning, when scrutinizing PPG's decision to hire Quinn Emanuel.

Here is how this case started: PPG learned of Defendants' scheme around February 18, 2015, when Defendants attempted to use the stolen trade secrets to order PPG's proprietary molds from AKI. (ECF No. 1, at ¶ 35.) Instead of fulfilling Defendants' order, AKI informed PPG. (*Id.* at ¶ 36.) This is a particularly important moment in this travail when it comes to deciding whether PPG acted reasonably by hiring Quinn Emanuel, rather than a local firm. For PPG, AKI's warning meant that someone stole proprietary technology worth millions of dollars. Even worse, the stolen technology fell under U.S. International Traffic in Arms Regulations—meaning that, under federal regulations, transfer of that technology to a foreign person or entity required approval by the U.S. Department of State. So the fact that the apparent thief claimed to operate out of China substantially raised the stakes for PPG.

AKI's news required a rapid and significant response—one that would necessarily involve significant cooperation with federal law enforcement. And that is exactly what happened. Within one (1) week of AKI's warning, FBI Special Agent Gregory Roth obtained the contents of Rukavina and Zhang's email correspondence and asked a federal magistrate judge for a warrant to

arrest Rukavina. (ECF No. 107-3, at 63–72.) By early May 2015, a federal grand jury had indicted

Rukavina for violating 18 U.S.C. § 1832(a)(2) and (a)(4). Then in early June 2015, after being

released on bond, Rukavina committed suicide, leaving PPG uncertain how it would learn the full

breadth of Defendants' scheme. (ECF No. 1, at ¶ 44.) That is the backdrop against which PPG

hired Quinn Emanuel: an ongoing federal criminal investigation into one of its former employees

accused of stealing valuable confidential documents and selling them to a foreign entity in

violation of federal arms control regulations and confidentiality agreements with PPG. Not exactly

the sort of "red car, blue car" fender bender at the intersection of Grant St. and Seventh Ave. that

any lawyer might easily take on.

In the Court's estimation, the Record reflects two (2) important facts when it comes to the

special expertise exception: First, when PPG needed to hire counsel, this case appeared remarkably

complex. Second, the Record reflects that PPG rationally concluded that Quinn Emanuel possessed

the sort of special expertise needed to handle the international litigation, federal law enforcement

coordination, and national security components of this case. (ECF No. 121-1, at 7–8, 12–57.) But

under the "forum rate rule," that is only two-thirds of the journey. PPG also has the burden of

showing that counsel in the forum could not provide equivalent expertise. *See ICO II*, 426 F.3d at

706.

As is already clear from the Court's damages discussion, this Opinion does not end the

litigation. When it comes time for PPG to resubmit its damages request in greater detail, the Court

will permit it to supplement its attorneys' fees request to address whether forum counsel could

have provided the same level of special expertise as Quinn Emanuel.[13] The Record, as it currently

---

[13] Because at least part of the supplemental filing must relate to PPG's attorney search at the front end of this case, in the Court's view, an affidavit from an appropriate decision maker at PPG may provide the clearest picture of the attorney hiring process that took place at the outset of this litigation. Such an affidavit would likely inform the Court whether PPG considered the presence or lack of the necessary special expertise amongst counsel in the forum. *Accord*

stands, shows that PPG made a good faith effort to establish the special expertise exception. And the national security and federal law enforcement aspects of this case, coupled with the presence of foreign parties, present a high likelihood that PPG would be unable to find suitable counsel in the forum.

None of this is meant as a criticism or commentary on the quality of the able counsel in this District. Rather, it is a commentary on the reality that when this case began, a rational purchaser of legal services would have concluded that even "local counsel" would have had to be a law firm that had a reach far beyond this District, both geographically and by virtue of its experience and professional capabilities. That likely being the case, it does not appear to the Court that the fact that PPG's chosen law firm maintains its home office outside this District makes any difference at all. After all, even if PPG had hired as principal counsel a law firm headquartered in this District, it is virtually certain that any such law firm would have had to call on reinforcements from one or more of its offices elsewhere, in this country or outside of it. What's more, PPG's decision to engage local counsel, in addition to Washington D.C. counsel, likely shows at least some effort to bill at forum rates for certain tasks. So the Court's decision to allow PPG a chance to supplement its motion is not a second bite at the apple, but rather a fair opportunity to clarify and supplement the Record in response to the Court's interpretation of § 5305(3).

2. **Reasonable Number of Hours**

A district court cannot reduce the number of hours sua sponte; it can only do so in response to specific objections from the defendant. *ICO II*, 426 F.3d at 711. But once the defendant lodges a specific objection, the burden shifts to the party requesting fees to show that the number of hours claimed is reasonable. *See id.* Yet in order for a defendant to make specific objections, the plaintiff

---

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.* (*ICO IV*), 726 F.3d 403, 413–14 (3d Cir. 2013).

must sufficiently detail what work relates to what invoice. Granular billing information is also needed because the Third Circuit has "stressed that it is necessary that the [District] Court go line, by line, by line through the billing records supporting the fee request." *ICO II*, 426 F.3d at 713 (quoting *Evans v. Port Auth. of N.Y. & N.J.,* 273 F.3d 346, 362 (3d Cir. 2001)) (internal quotation marks omitted).

Here, the hours breakdown that PPG included in its affidavit in support of its attorneys' fees request is not specific enough for the Court to carry out its obligation to scrutinize PPG's request. In the affidavit, PPG includes the names of all of the attorneys, paralegals, and support staff who worked on the case. (ECF No. 121-1, at 4–5.) For each individual, PPG provides the case responsibilities, hourly rate, total hours, and total fee. (*Id.*) But the description of each individual's case responsibilities is general—"Pre-suit litigation strategy," or "Third-party discovery disputes," or "Research and administrative litigation support." (*Id.*) PPG also attached the invoices it received from its attorneys. (*Id.* at 57–201.) While those invoices provide some more detailed hours information for each attorney, they do not explain what specific litigation tasks relate to each invoice. So the Court has no way of knowing, for example, if an attorney who billed sixty-seven (67) hours spent all that time on one (1) big project or sixty-seven (67) one-hour assignments. When PPG supplements its attorneys' fees request, it needs to include enough detailed information for the Court to meet the obligations instilled in Third Circuit precedent. *See ICO II*, 426 F.3d at 713; *see also ICO IV*, 726 F.3d at 416–17.

All that said, the Court is skeptical about Defendants' most vocal objections. For instance, Defendants suggest that PPG allowed too to many attorneys work on this case, with the implication being that so many cooks in the kitchen unduly inflated the final bill. Yet almost ninety (90) percent of the hours billed by Quinn Emanuel came from one (1) partner and one (1) associate. So many

of the other attorneys and staff involved in this case appear to have only worked on discrete assignments. (ECF No. 121-1, at 4–5.)

Defendants also object to the sheer number of hours billed, given that this case resulted in a default. Defendants' argument might sound logical in theory but does not hold up against what really happened in this case. Yes, there was never an answer, motion to dismiss, or any other adversarial litigation up until Defendants challenged the entry of default and opposed a default judgment. But that lack of adversarial litigation is exactly why PPG was forced to spend so many attorney hours on third-party discovery and default motions practice. After all, such third-party discovery, which presented significant complexity given the facts of this case, was only necessary because Defendants refused to participate in the litigation. So without the usual tools of discovery, PPG had to obtain critical information the hard way. In many ways the Defendants' argument rings pretty hollow, in that it was the nature of their patently unlawful conduct, coupled with their "catch us if you can" approach, that seemingly necessitated the legal pursuit that PPG had to engage in. The Court will withhold a final decision on attorneys' fees until PPG submits its supplemental filing. But Defendants should not bet on the Court rewarding them for their refusal to meaningfully partake in this litigation.

### 3. Costs and Expenses

A party requesting costs under a fee shifting statute must provide a level of detail similar to that required for its billable hours request. *See ICO II*, 426 F.3d 710–14. Here, many of PPG's costs and expense requests are too vague for the Court to scrutinize. For example, PPG lists "Attorney Services" and "Professional Services" as costs in its affidavit. (ECF No. 121-1, at 6–7.) Yet for many of these expenses, the requested amounts are relatively low. So while PPG needs to clarify these expenses in its supplemental petition, the vague costs are not really driving the total

request amount.

PPG does need to better explain its travel expense request. In *ICO II*, the Court of Appeals held that when a party relies on the special expertise exception to the "forum rate rule" and hires out-of-forum counsel, it usually cannot recover the cost of counsel's travel to and from the forum. *See ICO II*, 426 F.3d at 710. So PPG needs to explain why the travel-related costs that it requests are consistent with Third Circuit case law. All of this should be included in the supplemental petition.

## IV.    <u>CONCLUSION</u>

The Court concludes that it can exercise personal jurisdiction over all Defendants consistent with Pennsylvania law and the United States Constitution. Defendants' Motion to Set Aside Default (ECF No. 129), is **DENIED**.

PPG's Motion for Default Judgment (ECF No. 106), is **GRANTED** to the extent that the Court concludes: (1) PPG has established Defendants' liability for PUTSA misappropriation under 12 Pa. Cons. Stat. § 5302; (2) research and development costs are an acceptable means of measuring Defendants' unjust enrichment; (3) Defendants' misappropriation of PPG's trade secrets was willful and malicious under 12 Pa. Cons. Stat. § 5304(b), so the Court awards exemplary damages; (4) the amount of exemplary damages awarded will be the maximum permitted under PUTSA; (5) the Court will enjoin Defendants' use and threatened use of the misappropriated PPG trade secrets; (6) Defendants are ordered to return all of PPG's trade secrets provided by Rukavina or other former PPG employees to PPG; and (7) because Defendants' misappropriation was willful and malicious, the Court awards attorneys' fees, costs, and expenses under 12 Pa. Cons. Stat. § 5305.

PPG's Motion is **DEFERRED** without prejudice as to its damages amount calculation, as

insufficiently detailed, and its attorneys' fees, costs, and expenses amount calculation, as insufficiently detailed. On the issue of damages, the Court will Order PPG and Defendants to mediation to attempt to reach an agreeable final damages calculation that is consistent with this Opinion, along with the potential resolution of the other open matters as set forth in this Opinion. Following mediation, if the parties have not resolved all open matters, then PPG will as necessary submit a more detailed damages request, along with a detailed supplemental request for attorneys' fees, expenses, and costs, as well as further support for its invocation of the special expertise exception to the "forum rate rule." Of course, should some or all of those matters be resolved in the mediation process, then such submissions will either be unnecessary, or will be somewhat more limited.

      An appropriate Order will follow.

/s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: March 31, 2020
cc:    All counsel of record via ECF